IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

03 JAN 23  PM 3: 23

U S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JACQUELINE HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.: 02-PT-477-M |
| | ) | |
| CONTINENTAL CASUALTY | ) | |
| COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

ENTERED

JAN 2 3 2003

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be heard at a bench trial on October 21, 2002.

## FACTS AND PROCEDURAL HISTORY

This case involves an accidental death insurance policy, issued by Continental, that covered Jacqueline Harris ("Mrs. Harris") and Mrs. Harris' husband, Willie Harris ("Mr. Harris"). Mr. Harris died on September 28, 2000, seventeen days after he was in an automobile accident. The controversy surrounds the cause of Mr. Harris' death and policy provisions related thereto. The case is another of the ERISA cases which have been inundating this court raising the double questions of whether the decisions of others are appropriate and what decisions of this court are appropriate. This court will attempt to travel the maze of legal and factual issues which invariably arise in such cases, each side always suggesting different solutions.

At the time of his death, Mr. Harris suffered from a variety of diseases and state of health conditions. Among them, he suffered from diabetes, hypertension, coronary artery disease, peptic ulcer disease, and end-stage renal disease. The latter condition required Mr. Harris to receive ongoing kidney dialysis. At the time of the accident, he required dialysis three days a

week,  He had been receiving dialysis 1 ½ years prior to the accident.  End state renal disease

means that dialysis of the kidneys is required.  Prior to the accident, Mr. Harris appeared, to his

wife, his pastor and two friends, to be active and in good health.  On the morning of September

11, 2000, while driving to dialysis, Mr. Harris was involved in a one-car accident.  Mr. Harris

was driving near Highway 431 in Attalla, Alabama, during the early hours of the morning.  Due

to a heavy fog, Mr. Harris came upon a stop sign too quickly.[1]  Mr. Harris' truck went across the

highway and struck a tree.  Mr. Harris was taken to the emergency room at Gadsden Regional

Medical Center ("Gadsden Regional").  The records show that as a result of the accident, Mr.

Harris suffered compression fractures in his back at L2-L3.  Mr. Harris also suffered a

subarachnoid hemorrhage.  After being treated and released from the emergency room, Mr.

Harris went on to his dialysis.  However, en route, he began projectile vomiting.  Mrs. Harris

took Mr. Harris back to Gadsden Regional, and he was admitted that same day.   On September

11, 2000 and September 13, 2000, Mr. Harris was given heparin, a blood thinner which allows

the blood to flow more freely.

On September 13, 2000, Dr. Kenny Smith ("Smith") ordered a CAT Scan on Mr. Harris.

The CAT Scan revealed an "obvious" subdural hemorrhage.  Because of the severity of the

hemorrhage, Mr. Harris was admitted to the intensive care ward.  Another scan was performed on

September 17, 2000.  This scan revealed the hemorrhage; however, the condition had "improved

slightly" since the initial scan.  There was no evidence of infarction.  Another scan was

---

[1]While the defendant objects to this finding, there is no substantial evidence that the accident occurred
otherwise or that the subarachnoid hemorrhage preceded the accident or that the defendant took any such position
when denying the claim.  It is immaterial as to exactly how the accident occurred.  The main point is that there is no
evidence that a subarachnoid hemorrhage preceded the accident.

performed on September 23, 2000, which showed an "improving appearance of intracranial hemorrhage compared to 9/17/00." The scan also showed that the hemorrhage was "less prominent" than it had been, and that there were no new areas of infarction or extra axial fluid collections. Mr. Harris was released from intensive care on September 26, 2000, although he remained in the hospital. On September 28, 2000, while undergoing a dialysis treatment, Mr. Harris suffered severe hypotension, or loss of blood pressure. The doctors attempted to resuscitate Mr. Harris, but he ultimately died.

On January 20, 2001, Mrs. Harris presented a claim to Continental for accidental death benefits. As support for the claim, she filed (1) an Alabama Uniform Traffic Accident Report, showing that Mr. Harris had in fact been involved in a car accident on September 11, 2000, (2) the Certificate of Death for Mr. Harris, issued October 19, 2000, (3) an Attending Statement, a form provided by Continental, signed by Smith, (4) a Claimant's Statement, another form provided by Continental, and (5) Mr. Harris' admission and discharge sheets from Gadsden Regional. The Certificate of Death indicated that Mr. Harris' cause of death was "subarachnoid hemorrhage," caused by a "closed head injury" due to a motor vehicle accident. The Attending Statement indicated the cause of death to be a "subarachnoid hemorrhage."

Upon receipt of Mrs. Harris' claim, Continental gathered Mr. Harris' medical records and submitted them to an "independent" consultant, Dr. LeForce. Dr. LeForce, a neurologist, reviewed the records and concluded that Mr. Harris' prior medical problems were the main cause of his death. Specifically, he concluded that the subarachnoid hemorrhage was a contributing factor only, and that it would not have caused Mr. Harris' death in the absence of his prior medical conditions. Dr. LeForce was incorrectly of the opinion that Mr. Harris developed sepsis,

3

a blood infection, while hospitalized. On April 23, 2001, Continental denied Mrs. Harris' claim

for accidental death benefits, based upon the medical records and the evaluation by Dr. LeForce.

Continental determined that the head injury did not cause death "directly and independently of all

other causes," as required by the plan. Moreover, Continental noted that the policy excludes

death that results from "[s]ickness or disease." The denial letter stated:

> The policy under which you have filed claim is an Accidental Death and
> Dismemberment policy that provides a lump sum benefit should you or your eligible
> covered dependents die due to a covered injury. Injury means "bodily injury caused
> by an accident which occurs while the insured person is covered under this policy and
> that results, directly and independently of all other causes, in loss covered by the
> policy."

Mrs. Harris appealed the denial and submitted additional documents. First, she filed a

consultation report made by Dr. Gary Won Kwon ("Kwon"). The report was made on September

11, 2000 while Mr. Harris was at Gadsden Regional. Also, she submitted a letter from Smith

dated August 8, 2001. In that letter, Smith opined that it was "highly probable" that Mr. Harris

"suffered a rebleed from the original subarachnoid hemorrhage," causing the hypotension that led

to his death. Again, Continental sought the opinion of Dr. LeForce. Dr. LeForce determined

that, even in light of the new documents, there was no change in his position. On October 29,

2001, Continental again denied coverage, based in part on Dr. LeForce's recommendation. Mrs.

Harris filed another appeal but Continental, based upon another review, denied the claim on

December 3, 2001. Ms. Gloss, an RN and a member of the Appeals Committee of Continental,

reviewed the claim on appeal. She rejected Dr. Kenny Smith's opinion of a rebleed, at least

partly because she decided that there was no objective evidence to support the conclusion.

Ms. Gloss accepted the fact that the subdural hematoma was caused by the accident. Ms.

4

Gloss never spoke to Jackie Harris, Dr. Smith or Dr. LeForce.  Apparently Dr. LeForce based his

opinion purely on written records.

There was no provision in the insurance policy which requires that objective evidence be

presented to substantiate a claim.  However, Ms. Gloss stated that CNA requires objective

evidence in evaluating claims.[2]

On December 3, 2001 Mrs. Gloss on behalf of the Appeals Committee denied the appeal

based on the definition of injury which is considered language of the general clause:[3]

> According to the policy provision, the definition of "injury" means bodily
> injury caused by an accident which occurs while the insured person is covered under
> this policy and that results directly and independently of all other causes in loss
> covered by this policy.  In order to be eligible for benefits in accordance with the
> policy provisions, the clinical evidence must reveal that Mr. Harris' death resulted
> directly and independently of all other causes.  According to the Medical evidence
> with Mr. Harris' claim file, he had multiple long standing conditions, including end
> stage renal failure, congestive heart failure, severe hypertension, cardiomyopathy, and
> coronary artery disease, to name a few.

The Gadsden Regional Medical Center admission records of September 11, 2000 stated:

> "The patient does complain of having some left frontal headache and some
> discomfort in his lower back.

ASSESSMENT:

> 1. Motor vehicle accident with concussion
> 2. Weakness in his back with back discomfort
> 3. Non-insulin dependent diabetes mellitus
> 4. Uncontrolled hypertension
> 5. Ed-stage renal disease on hemodialysis
> 6. Coronary artery disease

---

[2]Defendant argues that Mrs. Gloss was "tactically lead (sic) into the use of the term 'objective evidence' by [plaintiff's] counsel."  The same could be said of much of the "tactical" leading of Dr. Smith by defense counsel in Smith's deposition.

[3]29 U.S.C. § 1133(1) and 29 C.F.R.§ 2560.503-1 may restrict the court's consideration of defendant's reasons for denial to those given to the plaintiff at the time of denial.

7. Chronic Anemia secondary to renal failure."

After exhausting her administrative remedies, Mrs. Harris filed suit in the Circuit Court of Etowah County, Alabama. Continental removed the action to federal court on February 22, 2002. Mrs. Harris then filed an amended complaint on March 26, 2002, alleging a wrongful denial of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. § 1132(a)(1)(B).[4] In addition to benefits due under the plan, Mrs. Harris seeks attorney's fees and prejudgment interest at the rate of 18%.[5]

On August 10, 2002, Continental deposed Smith, and subsequently submitted Smith's deposition to the court. In the course of the deposition, Continental elicited several statements from Smith. First, Smith acknowledged that, as a general matter, any of Mr. Harris' various conditions *could eventually have* led to his death. More specifically, Smith acknowledged that it was *possible* that these existing diseases *could have* caused the hypotension that ultimately killed Mr. Harris. Ultimately, Smith acknowledged that without an autopsy or another CAT Scan, neither of which were performed on Mr. Harris, there was no way to determine, to a medical certainty, what exactly caused his death.[6]

The foregoing are facts developed during the court's consideration of cross-motions for summary judgment and validated and found by the court as the result of the trial. The court will

---

[4]Mrs. Harris does not cite 29 U.S.C. § 1132(a)(1)(B), yet, based on the allegations in the complaint, the court assumes that this section is the basis of the lawsuit.

[5]Initially, Mrs. Harris sought accidental death benefits under the policy. After motions and briefs were filed, Mrs. Harris amended her complaint a second time to include a claim for the monthly in-hospital benefit provided for under the policy. These benefits have been paid.

[6]While the defendant seems to argue that this lack of certainty works solely in its favor, it could be a two-edged sword.

6

supplement those findings with the following additional, sometimes overlapping, findings of underlying facts:

### Medical Condition from 9/11/00 (date of accident) and after.

9/11/00: Consultation Report of Dr. Gary Kwan. Kwan lists Mr. Harris' past medical history as "renal disease, diabetes, hypertension, diabetic retinopathy, peptic ulcer disease, coronary artery disease." Under the section entitled "Review of Systems," Kwan states that "the patient denied any chest pain, shortness of breath, orthopnea, productive cough or hemoptysis." He also states that Harris complained of "nausea, vomiting." Under "Physical Examination," Kwan states that Harris was "lying in bed without any acute cardiopulmonary distress. . . Blood pressure is 208/91, pulse rate is 104, respiratory rate 20." Under "Recommendations," Kwan states "we will continue renal management and tight control of hypertension during hospitalization." Pl. Ex. 5.

The Gadsden Regional Medical Center admission records of September 11, 2000 stated:

> "The patient does complain of having some left frontal headache and some discomfort in his lower back.
>
> ASSESSMENT:
>
> 1. Motor vehicle accident with concussion
> 2. Weakness in his back with back discomfort
> 3. Non-insulin dependent diabetes mellitus
> 4. Uncontrolled hypertension
> 5. Ed-stage renal disease on hemodialysis
> 6. Coronary artery disease
> 7. Chronic Anemia secondary to renal failure."

9/11/00: Document entitled "History and Physical." Includes same history of medical problems, but also includes: "diabetes mellitus . . . and peripheral arterial vascular disease." Quotes Harris as saying that he hit his head in the accident, but could not remember whether he lost

7

, consciousness.  Notes that Harris complained of left frontal headache pain and discomfort on his lower back.  Under "Review of Systems," states "no chest pain, shortness of breath, paroxysmal nocturnal dyspnea or orthopnea."  Under "Physical Examination," states "pulse 118, respiration 20, blood pressure 177/88."  Notes that Harris is "moderately obese."  For Harris's heart, "regular rate and normal rhythm without clicks, murmurs, gallops or rubs."  Pl. Ex. 6.

9/12/00: Exam of back/lumbar.  Nothing relevant other than fact of damage to back.  Def. Ex. 3.

9/13/00: Consult report of Dr. Andrade.  Lists the various medicines that Harris was on.  Notes that Harris is "quite lethargic. . . blood pressure 185/125."  Under mental status, states "It is difficult to get his name from him.  He does not respond to other questions.  He requires repeated stimulation to get him to respond."  Def. Ex. 3.

9/13/00: Initial CT Scan.  Notes "obvious hemorrhage is present overlying the posterior aspect of the temporal lobe and involving the left occipital lobe.  Concurrent free subarachnoid blood is also noted.  The remainder of the study is unremarkable."  Def. Ex. 3.

9/13/00: Echocardiography Report.  Seems to say everything relatively normal, or at least no problems.  Def. Ex. 3.

9/15/00: Cerebral Angiogram.  Everything, at least regarding an aneurism, seems to have been normal.  Def. Ex. 3.

9/17/00: Consult report from Dr. Hakim.  Discusses reduced level of consciousness and respiratory failure.  This is the point they decide to try BiPAP on him.  Def. Ex. 3.

9/17/00: Consult report of Dr. Newman.  Discusses treatment to that point.  Def. Ex. 3.

9/17/00: CT Scan #2.  Notes the hemorrhage, and states "the degree of mass has improved slightly compared to 9/13/2000.  There is no evidence of infarction."  Under "Impression," states

8

"slight improvement in hemorrhage since 9/13/00." Def. Ex. 3.

9/23/00: CT Scan #3. States that "the hemorrhage identified on 9/17/00 is less prominent. There are no new areas of infarction. There are no extra-axial fluid collections." Under "Impression," states "improving appearance of intracranial hemorrhage compared to 9/17/00/" Def. Ex. 3.

9/23/00: Discusses how feeding tube was inserted into Harris. Def. Ex. 3.

9/27/00: Chest Exam. Discusses what has been done, and then states "there is no evidence of a post-procedural pneumothorax." Def. Ex. 3.

9/27/00: Discusses an operation performed on Harris, called "new left subclavian central line and new right IJ Perma-cath." Describes procedures and states that Harris took it well. Def. Ex. 3.

9/28/00: Abdomen exam. Discusses feeding tube and finds no problems associated with it. Def. Ex. 3.

9/28/00: Discharge Summary. In section titled "diagnoses at time of death," lists, in addition to past medical problems, "subarachnoid hemorrhage, subdural hematoma, status post motor vehicle accident with closed head injury." List same symptoms found in "History and Physical" document, including pulse and heart rate. Notes that Harris "had progressive confusion on the evening 9/13/00 and the CT scan of the head was done at that time. This revealed a subarachnoid hemorrhage . . . patient was moved to intensive care."

Under "Hospital Course," it notes that "patient underwent cerebral angiography and no aneurysm or arteriovenous malformation was found. It was essentially a normal angiogram. The patient was monitored in the intensive care unit and was treated for his medical problems. His blood sugars were monitored and he had followup CT scans of the brain which revealed improvement of the subarachnoid hemorrhage. The patient continued to be confused throughout

9

the hospital stay." It also states that "the patient did develop some central, hypercapnic

respiratory failure that required BiPAP therapy for a couple of days and then had improvement.

His breathing remained good after that therapy. The patient improved to the point to the point

and was stable that he could be moved from the intensive care unit to a telemetry bed on the

ninth floor on 9/26/00." Pl. Ex. 7. Def. Ex. 3. Specific statements included:

> "DIAGNOSES AT TIME OF DEATH
>
> Subarachnoid hemorrhage,
> Subdural hematoma,
> Status post motor vehicle accident with closed head injury,
> Possible acute myocardial infarction,
> Chronic renal failure on hemodialysis, insulin-dependent diabetes mellitus,
> Essential hypertension."

10/19/00: Certificate of Death. Certificate lists the "immediate cause" of death as: "subarachnoid

hemorrhage; closed head injury; motor vehicle accident." In section titled "other significant

conditions," the certificate lists "chronic renal failure; insulin dependent diabetes." Manner of

death is listed as an "accident." How injury occurred is listed as "motor vehicle accident." Pl.

Ex. 2.

1/22/01: Attending statement filed by Dr. Smith. For "nature and extent of the injury," Smith

wrote "head injury with subarachnoid hemorrhage and subdural hematoma." For "Primary cause

of death," Smith wrote "subarachnoid hemorrhage." For "secondary or contributory cause,"

Smith wrote "possible myocardial infarction." When asked whether any other disease or cause

operated as a "complication" or "contributed to" death, Smith checked "yes." Pl. Ex. 3.

4/19/01: Peer review #1 from Dr. LeForce. States that "The subarachnoid hemorrhage was a

contributing factor. The subarachnoid hemorrhage was not of such severity to cause his death in

10

the absence of the other conditions." Later, notes that "the available medical records indicate improvement in this injury during the hospitalization." Discusses previous problems, then states "since there was objective evidence of improvement in the intracranial injury, the cause of death is most likely the patient's long standing medical conditions and the intracranial hemorrhage was a contributing factor." Def. Ex. 3.

8/8/01: Letter from Dr. Smith. Notes that during the hospital stay, Mr. Harris was continued on hemodialysis. Notes that Harris "did have follow up CT scans of the brain, which did show improvement of the subarachnoid hemorrhage . . . [but] he had continued confusion." Finally, after discussing Harris death, states that "It is highly probable the patient suffered a rebleed from the original subarachnoid hemorrhage, which was caused by the original motor vehicle accident." Pl. Ex. 8.

10/18/01: Peer review #2 from Dr. LeForce. Although no change from previous recommendation (to deny benefits), still states that "subarachnoid hemorrhage was a contributing factor in his death. There was noted to be improvement in this hemorrhage during the hospital stay, so it was likely not the direct cause of death. The note from Dr. Smith . . . is not supported by any objective evidence in this case." Later, he states "since there was objective evidence of improvement in the intracranial injury, the cause of death is most likely the patient's long standing medical condition and the intracranial hemorrhage was a contributing factor." Def. Ex. 3.

### Discussion of Prior Medical Conditions

(All are in Def. Ex. 3)

2/9/98: Discussing renal disease.

11

.   7/17/98: Discussing heart tests.

8/6/98: Discusses renal disease, saying no change since 2/9/98 test.

9/11/98: Went to hospital for chest pain.  Test done; report seems to say that he had problems.

Discusses poor performance on several tests given.

10/9/98 through 10/12/98: Admitted for shortness of breath.  Discusses heart problems of Harris

and tests done; on 10/11 states "there has been significant clearing of the perihilar densities since

last examination.  The central pulmonary markings remain prominent on the left."  More

discussion of his renal disease.

3/6 through 3/10/99: Admitted to hospital for shortness of breath.  Discusses all prior medical

problems.  Notes that he was having problems associated with congestive heart failure, but

eventually resolved to the point where he could be released.

3/23/99: Consultation report from Gadsden Regional.  Mentions congestive heart failure and

renal disease.

3/28/99: Notes that the symptoms of 3/23/99 have improved.

### Deposition Testimony of Dr. Smith - Taken August 10, 2002:[7]

Direct Exam of Smith by Shaw:

1.  Pages 7-22: General background about Harris' prior medical condition.  States that he had

treated Harris since 1991.  Lists the various conditions he has treated Harris for.  Stated that, in

general, he saw Harris about every 3 months.  Notes that end stage renal disease does not mean

---

[7]There is a substantial issue of whether Dr. Smith's deposition should be considered by the court since it was not considered prior to the denial of the claim by defendant.  In any event, notwithstanding the discussion of certain "possibilities," Smith's ultimate opinions do not substantially differ from what was provided to the defendant prior to its denial.  Obviously, anyone with significant diseases could possibly die at some time from such diseases. With regard to admissibility, plaintiff relies upon *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321, 1327-28 (11th Cir. 2001).  The defendant relies upon *Kirwan v. Marriott Corp.*, 10 F.3d 784 (11th Cir. 1994).

near.death.  People can survive up to 10 or 20 years on dialysis.  Notes Harris had severe diabetes for at least 10 years.  Notes that all of Harris's conditions, especially in conjunction with each other, could result in death.  Discussion of results/effects of high blood pressure.

2. <u>Pages 22-36</u>: Discusses general treatment, etc. performed on Harris while at Gadsden Regional on the dates in question.  Notes that several CAT Scans were done, and that there was improvement.  Notes that no surgery was needed because "it was improving, and, you know, it didn't show at that he was at that point having any continuing rebleeding."  Notes that "it's possible" that Harris' continued confusion could have been caused by stress of being in hospital.  Discusses angiogram performed, showing no aneurism or problems that would affect blood flow through head or body.  Smith notes that the subsequent CT Scans show that the hemorrhage was improving, not that it was resolved.

3. <u>Pages 36-40</u>: Discusses Harris' breathing problems once he was in the hospital.  Notes that Harris' prior conditions or the head injury could be the cause (or other causes as well).

4. <u>Pages 40-42</u>: Shaw points out that there is no mention in any records that the hemorrhage was life threatening or requiring any particular kind of treatment.  Smith responds that they would not put that in the record.  Putting Smith in I.C.U. speaks for itself.  Again, Shaw points out that the CT Scans show that the hemorrhage was improving.

5. <u>Pages 42-47</u>: Begin discussing the hypotension that ultimately killed Harris.  Notes that almost any of the conditions that Harris had could have caused the hypotension.  Notes that no post-death CT Scan or autopsy was performed.  Smith admits that he cannot say to a medical certainty what caused the hypotension (p.45-46).

6. <u>Pages 47-51</u>: Discusses Smith's qualifications and his relationship to Mrs. Smith (co-worker,

13

. etc.).

7. Pages 51-53: Discusses a prior time when Harris had a case of abdominal and/or rectal bleeding.

8. Pages 53-55: Again discusses the hypotension and the various things that could have caused it.

Exam of Smith by Allenstein:

1. Pages 56-62: Notes that Smith filled out the death certificate, listing subarachnoid hemorrhage as the cause of death. Discusses why Smith did so. Notes that "at that time" it was his opinion, but now "I don't have any reason to say that it couldn't have been the cause of his death." (p.58). Discusses attending form filled out by Smith. Again stated that hemorrhage was cause of death. Also discusses the August 8, 2001 letter. Smith states that the reason he listed cause of death as the hemorrhage was because of Harris' continued confusion (p.60-61).

2. Pages 62-67: Discusses Harris' symptoms. Notes that vomiting is one of the symptoms of intracranial pressure or bleeding. Discusses why he moved Harris to I.C.U. Discusses that head injury can cause hypotension. Discusses why he thought the accident caused the hemorrhage. States that heart attack might have been possible. States that cannot say what caused it (p.67).

3. Pages 67-68: Smith notes that a blood thinner can increase risk of rebleed, and that dialysis patients are given blood thinner to keep the blood from clotting in the machine.

4. Pages 68-75: Smith states that he disagrees with Dr. LeForce report. Notes that Harris was apparently given a blood thinner. Notes again that people can live a long time with end stage renal disease. Notes that diabetics can live for a long time with treatment. Discussion of where subarachnoid is.

14

5. Pages 75-76: Allenstein asks if the hemorrhage was the most likely of the causes of death, and Smith states "I felt that it was." Shaw then asks, "there is really no way to say that this man's death resulted from an accident independent, clearly, and exclusively from the accident, is there?" Smith responds "I couldn't say that, no."

### Trial Testimony of Mrs. Harris[8]

1. Pages 50-53: Discusses Harris' various conditions and prior hospitalizations, including for heart problems and kidney dialysis.

2. Pages 53-54: Discusses various medicines that he took, although she can't remember them all. Also discusses the effects that dialysis had on Mr. Harris

### Trial Testimony of Doris Gloss

Direct Exam of Mr. Shaw.

1. Pages 98-102: Discusses her background, how she came to work for Continental, etc.

2. Pages 102-108: Discusses the claims procedure; discusses how LeForce was chosen. Discusses whether she has the right to overrule LeForce's recommendation.

3. Pages 108-112: Gloss discusses difference between triggering event and a contributing factor/what is a direct cause. How do they determine that difference.

4. Pages 113-123: Begins discussing why they denied the claim. Notes that projectile vomiting, which Harris had at the beginning, is a symptom of hemorrhage in the brain. Gloss states that the original brain bleeding could have possibly been caused by something else. Discussion of how Gloss finally makes her factual determinations when the evidence suggests more than one thing.

---

[8]Trial testimony references are to an initial draft of reporter. Page numbers may not remain the same in final transcript.

Eventually, she says that she accepted as fact that the hemorrhage was caused by an accident (p.117). Gloss notes that the hemorrhage was improving, not resolved, but improving to the point that they could transfer him out of intensive care. She states that if it had continued to bleed, it would have been increasing, not decreasing. Discussion of what a subarachnoid hemorrhage is. Gloss begins to say that since they transferred Harris out of I.C.U., but after discussion with court, states that it is possible for the condition to return, even once out of I.C.U. (p.122-23).

5. Pages 124-143: Begins discussion of correspondence received from Dr. Smith. Gloss states that there was no objective evidence to support the theory that there was a rebleed. Gloss states that a rebleed would have caused more vomiting, very high blood pressure, and possibly even seizures. It does not cause hypotension, or low blood pressure, which is what killed Harris (p.127). States that people with insufficient dialysis can have the same symptoms that Harris had (confusion, etc.) because of waste buildup. Also states that some people get ICU psychosis. She reads from the discharge summary (p.134). Admits that the documents mention heart attack as possible cause of death, but does not mention any of Harris' other conditions as a possible cause of death. Discusses again whether, in regards to hemorrhage or heart attack, it was either/or, or a combination of the two, that killed Harris (p.136-37). Notes that the things that caused Harris death (hypotension, ventricular tachycardia) are consistent with heart attack and inconsistent with a rebleed. Says that she ultimately concluded that heart attack was the cause of death, although can't be sure because no post-mortem was done. States that she disagrees with LeForce that the hemorrhage was a contributing factor (p.141)[9] - does agree w/him that prior medical conditions

---

[9]Interesting indication of conflict and "taint" by self-interest.

16

. was.the main cause.  Agrees with most of LeForce, just not the bit about contributing factor.

## Insurance Policy Matters

The pertinent provisions of the applicable policy include the following:

"When a covered injury results in any of the following losses to an Insured Person within 365 days after the date of the accident, we will pay in one sum the indicated percent of the Principal Sum for:

Loss of Life..................................................................100%
(Policy p.2)

### Definitions

Injury means bodily injury caused by an accident which occurs while the Insured Person is covered under the policy and that results, directly and independently of all other causes in loss covered by the policy.  (emphasis supplied) (Policy p.2)

### Exclusions

The policy does not cover any loss caused by or resulting from...sickness or disease, except pyogenic infections which occur through an accidental cut or wound."  (emphasis supplied) (Policy p.7)

There is no dispute that the policy was in effect at the time of the accident.

Jacqueline Harris did not receive a copy of the insurance policy or a copy of a certificate of insurance.  She received a Summary Plan Statement which described the accidental death benefits as follows:

"Voluntary Accidental Death and Dismemberment (VAD&D) Benefits.  As an important benefit for you and your family, Quorum offers you the option of providing accidental Death and Dismemberment (AD&D0 coverage for your dependents as well as supplemental insurance for yourself.  You pay for 100% of the cost of this optional coverage.  You have a choice of ten options with principal amounts ranging from $25,000 to $250,000.  And, of course, you can choose 'no coverage.'"

The parties agree that Alabama law applies to the interpretation and application of the

. insurance policy provisions. They further agree that the case is governed by ERISA and that the

correct standard of review by this court is a "heightened arbitrary and capricious" standard.[10]

### CONCLUSIONS OF LAW

### Federal Law

1. This case is governed by the following language in *Brown v. Blue Cross & Blue Shield*

*of Alabama*, 898 F.2d 1556 (11th Cir. 1990).

> ...Because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business. That is, when an insurance company serves as ERISA fiduciary to a plan composed solely of a policy or contract issued by that company, it is exercising discretion over a situation for which it incurs "direct, immediate expense as a result of benefit determinations favorable to [p]lan participants." *De Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989) (explaining threshold for economic conflict of interest by fiduciary); *see also Slover v. Boral Henderson Clay Prod. Inc.*, 714 F.Supp. 825, 833-34 (E.D. Tex. 1989); *Gesina*, 780 P.2d at 1383. We conclude, then, as has one district judge in an opinion since *Firestone*, that a "strong conflict of interest [exists] when the fiduciary making a discretionary decision is also the insurance company responsible for paying the claims...." *Jader v. Principal Mutual Life Ins. Co.*, 723 F.Supp. 1338, 1343 (D. Minn. 1989).

*Id.* at 1561-62.

....

> In summary, we face for the first time (since *Firestone*) how to reconcile the inherent conflict posed by benefits determinations made by an insurance company administering its own policy. While *de novo* review is an attractive avenue for controlling the exercise of discretion contrary to the interest of the beneficiaries, the application of this strict standard would deny Blue Cross the benefit of the bargain it made in the insurance contract. *See Firestone*, 109 S. Ct. at 954. The *Firestone* court firmly endorsed the ability of parties to "agree[ ] upon a narrower standard of

---

[10]Adding to the perplexity of the case is the fact that the court, after discovering that the discretion granted was apparently to Quorum rather than Continental, raised the issue of whether the review should be *de novo*. The plaintiff now says that it should be. The defendant's response is vague on the point. The court's decision would be the same either way. See Exhibit I.

18

review." *Id.* at 956.  At the same time, we must control the tension between contractual standards of review and an interpretation of ERISA that "would afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.*  We therefore hold that the abuse of discretion, or arbitrary and capricious, standard applies to cases such as this one, but the application of the standard is shaped by the circumstances of the inherent conflict of interest.

*Id.* at 1562-63 (footnotes omitted).

....

  In accordance with the foregoing common law principles, we hold that when a plan beneficiary <u>demonstrates a substantial conflict of interest</u> on the part of the fiduciary responsible for benefits determinations, <u>the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest</u>.  That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries <u>unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries</u>.

*Id.* at 1566-67 (footnote omitted)(emphasis added).

....

  ... Even a conflicted fiduciary should receive deference when it demonstrates that it is exercising discretion among choices which reasonably may be considered to be in the interest of the participants and beneficiaries.  The fiduciary, however, should <u>bear the burden of dispelling the notion that its conflict of interest has tainted its judgment</u>.  If the fiduciary carries this burden, the party challenging its action may still succeed if the action is arbitrary and capricious by other measures.  This second level of evaluation is assisted somewhat by the narrowing of the justifications which the fiduciary may properly assert in defense of its actions.

*Id.* at 1568 (emphasis added).

  2. *See also Jett v. Blue Cross & Blue Shield of Alabama*, 890 F.2d 1137 (11th Cir. 1989).

  "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator <u>at the time the decision was made</u>."

*Id*. at 1139 (emphasis added).

    ....

        ...I agree that Blue Cross's denial of benefits must be reviewed only in light of the information available to it prior to the challenged decision.

*Id*. at 1141 (Johnson, concurring in part and dissenting in part).

    ....

        An administrator's decision must be supported by substantial evidence in order to avoid being found arbitrary and capricious.

*Id*. at 1141.

<u>Alabama Law</u>

        Of course, the court also considers Alabama law with reference to the interpretation and applications of the policy provisions. In that regard, the court notes the following.

        1. *Metropolitan Life Ins. Co. v. Nichols*, 393 So. 2d 966, 967-68 (Ala. 1981) (footnote omitted).

        The insurance policy at issue contained two relatively standard clauses: (1) a general clause providing recovery for injuries caused directly and exclusively by external, violent, and accidental means; and (2) <u>an additional clause excluding benefits for loss resulting directly or indirectly, wholly or partly, by disease or bodily or mental infirmity</u>. The issue of the interrelationship and applicability of these type clauses found within a single insurance policy was addressed by this court in *Wilson v. Liberty National Life Insurance Co.*, 331 So. 2d 617 (Ala. 1976), wherein we stated:

            In Alabama, policy language similar to that contained in the "general clause" has been construed to mean that "if the accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease or that the accidental injury would not have been fatal but for the infirmity." (Emphasis supplied.) *Liberty Nat'l Life Ins. Co. v. Reid*, 276 Ala. 25, 33, 158 So. 2d 667,

674 (1963).

However, our cases also hold that where the policy contains the "additional clause" then no recovery can be had where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident. *First Nat'l Bnak v. Equitable Life Assurance Soc. of the United States*, 225 Ala. 586, 590-91, 144 So. 451, 455 (1932); *Liberty Nat'l Life Ins. Co. v. Reid*, *supra*. With respect to the "additional clause," our cases also hold, as stated by Bouldin, J., in Equitable, *supra*:

> "But this does not mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death.
>
> The general rules of construing insurance policies favorably to the insured apply to these clauses touching bodily infirmity, etc."

Thus, it is that Harwood, J., in *Reid*, *supra* concluded:

> "If an injury starts a chain reaction resulting in death, recovery may be had even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical conditions without which the chain would be broken. Each case must be particularized."

(Emphasis added.)

....

2. *Orton v. Liberty National Life Ins. Co.*, 402 So. 2d 978, 979-80 (Ala. Civ. App. 1980)

(footnote omitted).

The court in *Reid,* citing as authority the case of *First National Bank of Birmingham v. Equitable Life Assurance Society of United States*, 225 Ala. 586, 144 So. 451 (1932), said: "When a policy contains the additional clause pertaining to death resulting wholly or in part, directly or indirectly, from disease or bodily infirmity, then if the disease, in cooperation with the accidental injury, is an efficient clause of death, then there can be no recover."

21

However, the court continued as follows: "If an injury starts a chain reaction resulting in death, recovery may be had even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical conditions without which the chain would be broken. Each case must be particularized. *New York Life Insurance Co. v. McGhee*, 260 F.2d 768 (5th Cir.)" *Id.,* 276 Ala. at 33, 158 So. 2d at 674.

Perhaps the meaning of the "exception clause" is better stated as follows: "To state it in different language, the exception in the policy is against liability for death produced by the accident and disease, which the accident did not produce, and not from liability by death caused by disease or infirmity which the accident itself did not produce." *Union Central Life Insurance Co. v. Scott*, 286 Ala. 10, 236 So. 2d 328 (1970).

Study of the cases cited including *Reid*, discloses that in each instance there had occurred an undisputed accident resulting in injury. The issue presented was then whether the accidental injury cause the death. It is said in *Reid* that if the evidence is in conflict as to whether an accident caused the death or whether the accident and a disease cooperating combined to cause death, there is presented an issue to be resolved by the trier of fact.

....

3. *Collins v. Metropolitan Life Ins. Co.*, 729 F.2d 1402, 1404-06 (11th Cir. 1984) (footnote

omitted).

A long-standing allegorical tug-of-war exists between the insurance companies and the Alabama courts in the accidental death benefits area, with the insured or insured's beneficiary being a highly partisan spectator. At the one end, the insurance companies have pulled for an accidental death, as defined in their "general clause," which is the equivalent of a truck dropping from the skies, striking squarely and killing instantly a perfectly fit human specimen clutching a just-issued physician's clean bill of health. When the Alabama courts responded to this position with a strong tug the opposite way by reading into the "general clause" a proximate cause test, allowing benefits where, but for an infirmity, the insured would not have died from the accident, the companies pulled back by citing in their policies an "additional clause" designed to negate the courts' undermining (from the companies' point of view) of the general clause. The additional clause disallows recovery where death results from the combined effects of an accident and a pre-existing disease which was accelerated and aggravated by the accident. *Metropolitan Life Ins. Co. v. Nichols*, 393 So. 2d 966, 967 (Ala 1981). <u>Responding at this point to a negative reaction from the bystanders, however, the Alabama courts have refused to allow the companies to succeed in regaining their original ground, by tugging back at the additional clause with the "chain</u>

reaction" theory, which the parties have placed at issue here.

The chain reaction theory is stated as follows:

Alabama courts, and this court, take a more reasonable view [regarding the additional clause]. If an insured has an active disease of such a character as to endanger the insured's life, apart from the accident, such a disease is a contributing cause that will bar recover. If however an injury starts a chain reaction resulting in death, recovery may be allowed even if one of the links in the chain is old age frailty and some of the links are dormant diseases or physical conditions without which the chain would be broken. [Emphasis supplied.]

....

... Regarding the general clause, which on its fact limits recovery to death resulting solely from an accident, Alabama law would allow appellant to recover if the accident were merely the proximate cause of the insured's death.

....

4. *The Union Central Life Ins. Co. v. Scott,* 236 So. 2d 328, 330-35 (Ala. 1970).

In construing clauses similar to the clause, "The double indemnity benefit shall be payable only if the death of the insured shall result directly, independently and exclusively of all other causes, from bodily injury affected solely through accidental, external and violent means," which clause appears in the policy with which we are presently concerned, we have held that if an accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease, or that the accidental injury would not have been fatal but for the infirmity. *First Nat. Bank of Birmingham v. Equitable Life Assur. Soc. of United States*, 225 Ala. 586, 144 So. 451, and cases cited; *Adkins v. Metropolitan Life Ins. Co.*, 235 Ala. 417, 179 So. 382; *Liberty Nat. Life Ins. Co. v. Reid*, 276 Ala. 25, 158 So. 2d 667; *Independent Life & Acc. Ins. Co. of Jacksonville, Fla. v. Maddox*, 284 Ala. 532, 226 So. 2d 315.

But the cases last cited lay down a different rule where the policy sued on not only contains a clause similar to that quoted in the preceding paragraph, which is sometimes referred to as the general clause, but also contains a clause similar to the following clause found in the policy here involved: "...provided that death occurring ...as a result directly or indirectly of any bodily... infirmity...is not an accident hereby insured against." The provisions last quoted are sometimes referred to as the

23

additional clause.  Where the policy contains the so-called additional clause, as well as the general clause, the cases last cited above indicate that if the disease, in cooperation with the accidental injury, is an efficient cause of death, then there can be no recovery for accidental death.

But in the Equitable case, *supra*, after stating the effect of the presence in the policy of the additional clause, we said:

> But this does not mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death.

In *Liberty Nat. Life Ins. v. Reid, supra*, where the policy sued on contained an additional clause, we observed:

> If an injury starts a chain reaction resulting in death, recovery may be had [286 Ala. 13] even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical condition without which the chain would be broken.  Each case must be particularized. *New York Life Insurance Co. v. McGehee*, 5 Cir., 260 F.2d 768.  (276 Ala. 33, 158 So. 2d 674).

In *Prudential Ins. Co. v. Calvin*, 227 Ala. 146, 148 So. 837, where the policy sued on also contained a so-called additional clause, we said on rehearing as follows:

> The provision in the policy contract, viz., "or directly or indirectly from bodily or mental infirmity or disease in any form," means, and can only mean, when construed in connection with the precedent clause, that, if the insured was suffering at the time of the accident with some infirmity or disease, and the accidental injury, operating with the disease, produces death, then this would not create liability; but, where the accident directly and immediately, exclusive of other causes, produces the bodily infirmity or disease, and death results therefrom, then the accident must be held to be the sole proximate cause of the death.

> To hold as contended for by appellant, this clause in the policy contract would require a construction that it embraced accidents, which produced immediate death, without intervening complications, which the accident itself produced.

> To state it in difference language, the exception in the policy

is against liability for death produced by the accident and disease, which the accident did not produce, and not from liability by death caused by disease or infirmity, which the accident itself did produce. (Authorities cited)

In *Independent Life & Acc. Ins. Co. of Jacksonville, Fla.* v. *Madd*ox, *supra*, we quoted approvingly the language hereafter set out from the opinion in *New York Life Ins. Co. v. McGehee, supra*:

> A review of the Alabama cases and the decisions of this court shows that considerable latitude must be allowed the jury in determining the question of causation. An insurer cannot escape liability simply by showing that some disease may have contributed to some extent to the insured's death. Most elderly people have some ailment, some latent disease. When an old person is injured, almost invariably an ailment is aggravated, a dormant disease is activated, and the effects of the injury intensified because of general frailty and lack of resistence to illness. Progressive weakness and increasing complications follow any time an old person is put to bed for any length of time. In every case therefore it is difficult to separate the effects of the accident from the effects of disease. The insurer would have us hold that there can be no recovery unless death is present at the scene of the accident, or openly waits in continuous attendance on an injured insured from the moment of injury to the moment of death. Alabama Courts, and this court, take a more reasonable view.

....

In this case, the evidence is without dispute that the insured was involved in an accident shortly before his death; hence our recent case of *National Life and Accident Insurance Company, Inc., a corporation v. Catherine L. Allen, as Executrix, etc.*, 285 Ala. 551, 234 So. 2d 567, is not apposite here.

The death certificate was not conclusive against the beneficiary as to the cause of the insured's death. It has only prima facie effect as to the facts stated therein. s 42, Title 22, Code 1940, as amended. *See* Act No. 492, approved July 9, 1943, Act of Alabama 1943, p. 454; *Aetna Life Ins. Co. v. Beasley*, 272 Ala. 153, 130 So. 2d 178; *Jefferson Standard Life Ins. Co. v. Wigley*, 248 Ala. 676, 29 So. 2d 218, and cases cited; *United Security Life Ins. Co. v. Clark*, 40 Ala. App. 542, 115 So. 2d 911.

....

25

In *Police & Firemen's Ins. Ass'n v. Mullins*, 260 Ala. 173, 69 So. 2d 261, we affirmed a judgment in favor of the plaintiff rendered in a suit brought on a fraternal benefit insurance policy which contained clauses similar to those with which we are concerned on this appeal. In that case the experts testified that the insured died as a result of coronary occlusion with antecedent atherosclerosis of lone standing and that there was no indication of carbon monoxide poisoning, which the plaintiff contended cause the death of the insured. There was no expert testimony to the contrary. Based on the testimony of lay witnesses as to the apparent good health of the insured prior to the time he became ill and on testimony going to show the circumstances existing in the home of the insured at the time he was stricken, we held that the trial court did not err in refusing to give the general affirmative charge with hypothesis requested by the defendant. To like effect is *American Nat. Ins. Co. v. Reed,* 26 Ala. App. 350, 160 So. 543.

....

5. *Liberty National Life Ins. Co. v. Reid*, 158 So. 2d 667, 673-74 (Ala. 1963) (footnote

omitted).

In construing general clauses similar to the ones contained in the present policies, that is "death resulting direct and sole from accidental means, exclusive or independent of all other causes," it is the doctrine of our cases that if the accident aggravated a disease and hastened the death of the insured, the accident is yet considered the proximate cause of the insured's death, notwithstanding the gravity of the disease or that the accidental injury would not have been fatal but for the infirmity. *First National Bank of Birmingham v. Equitable Life Assur. Soc., of the United States*, 225 Ala. 586, 144 So. 451, and cases cited.

The Equitable case, *supra*, enunciates the further doctrine that where a policy contains the additional clause pertaining to death resulting wholly or in part, directly or indirectly, from disease or bodily infirmity, then if the disease, in cooperation with the accidental injury, is an efficient cause of death, then there can be no recovery.

However, as stated in the Equitable case, *supra*, by Bouldin, J.,

But this does now mean that mere feebleness, nor predisposition to recurrence of former disease, nor every infirmity which may aggravate the effects of an accidental injury, is to be regarded as the cause of death,' and further, 'The general rules of construing insurance policies favorably to the insured apply to these clauses touching bodily infirmity, etc.

26

If an injury starts a chain reaction resulting in death, recovery may be had even if one of the links in the chain is old age, frailty and some links are dormant diseases or physical conditions without which the chain would be broken. Each case must be particularized. *New York Life Insurance Co. v. McGehee*, 5 Cir., 260 F.2d 768.

Where the evidence is conflicting as to whether an accident was the cause of an insured's death, or whether the accident and a disease cooperating therewith combined to cause death, then ordinarily a question of fact within the resolution of the trier of fact is presented. *John Hancock Mut. Life Ins. Co. v. McCreary*, 37 Ala. App. 493, 70 So. 2d 817; *Emergency Aid Ins. Co. v. Connell*, 258 Ala. 521, 63 So. 2d 603; *Metropolitan Life Ins. Co. v. Halsey*, 230 Ala. 193, 160 So. 248.

## CONCLUSION OF COURT[11]

After consideration of the facts and the applicable legal principles, the court concludes, whether considered *de novo* or under a heightened arbitrary and capricious standard, that the defendant's denial was wrong and that the plaintiff is due to recover. This conclusion is premised, *inter alia*, on the following:

(1) The court gives more weight to the opinion of the treating physician, Dr. Smith, than to the opinion of defendant's retained evaluator, Dr. LeForce.

(2) The defendant has a conflict of interest and has not met its burden to prove that its decision was not tainted by self-interest.

(3) The court concludes, from a preponderance of the evidence, that the cause of Mr. Harris' death was the automobile accident and that, in any event, the accident started a "chain reaction" resulting in death. If the plaintiff had died at the scene of the accident, there would be little question. In any event, however, there was a continuous history of the head injury problem

---

[11]For other discussion of applicable law, see the Memorandum Opinion of the court filed on October 10, 2002 with regard to the parties' cross motions for summary judgment. Also see attached e-mail responses to questions the court posed while considering the case after trial.

from the time of the accident to the time of death.  This is not a case where there was only a minor injury which could not have independently caused the death of Mr. Harris.  The case involves a serious injury to the head and the severity is further evidenced by the injury to the spine.  The treating physician attributed the cause of death to the head injury and a re-bleeding.  The defendant disregarded that opinion.  There is no substantial evidence that the plaintiff would not have continued to live for an indeterminate time in the absence of the accident.  The court concludes that Mr. Harris' death was caused by the subarachnoid or subdural hemorrhage and the re-bleeding related thereto and that there is no substantial evidence that any particular pre-existing disease(s) contributed to the cause of death.  The fact that the deceased was elderly and perhaps frail is not sufficient to overcome this conclusion; particularly in view of the conflict of interest and defendant's tainted judgment.  The court's decision would be the same whether considered under the "general clause" or the "additional clause."[12]  It would also be the same whether considered *de novo* or under a heightened arbitrary and capricious standard.

In summary, the court concludes, whether considered *de novo* or under a heightened arbitrary and capricious standard, that the plaintiff should prevail.  The decision was wrong and the defendant has not met its burden to overcome the taint of its conflict of interest if considered under the heightened arbitrary and capricious standard.  Further, if considered *de novo*, the court finds from a preponderance of the evidence that the denial was wrong because, *inter alia*, insufficient weight was given to the treating physician's opinion.  The court further finds, from a preponderance of the evidence that the plaintiff should prevail.  The court's decision is the same

---

[12]It is not clear whether the insured received the "additional" clause.  *See Brown Mach. Works & Supply Co., Inc. v. Ins. Co. of North America*, 659 So. 2d 51 (Ala. 1995).  There is a further issue as to whether the defendant can now rely upon an "additional" clause if it denied the claim based upon "general" clause.

whether or not Dr. Smith's post denial deposition is considered.  The court further calls attention

to the discussion in *Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322-23 (9th Cir. 1995) of

the 11th Circuit *Brown* case.  The Ninth Circuit uses the term "presumptively void" as being

akin to the *Brown* burden of proof discussion.  This court, of course, follows *Brown*.

Within ten (10) days the plaintiff will submit a proposed judgment.  The defendant will

have seven (7) days to object as to the form and consistency with this opinion.  Prior to

submitting the proposed judgment, the plaintiff will attempt to resolve any issue regarding

prejudgment interest.  If the parties cannot agree, the court will refer that issue to a magistrate

judge for a report and recommendation.

This the ⅔ day of January, 2003.

**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**

# SUMMARY PLAN DESCRIPTION

## FOR

# QUORUM FLEXIBLE BENEFITS PROGRAM

### Supplement to BenefitPartners Workbook

# BenefitPartners
QUORUM & YOU

Exhibit 1

# INTRODUCTION

This Supplement, together with the workbook you received entitled *BenefitPartners* is a summary plan description of the Quorum Health Group, Inc. Flexible Benefits Program (the "Plan").

This summary plan description is intended only as a general summary of the basic provisions of the Plan and is not a substitute for the official plan document. If there are any inconsistencies between the summary and the plan document, the plan document always prevails. You are welcome to examine at your employer's offices the complete plan document upon which this summary is based.

Under the Plan, you may select Medical, Dental, Vision, Life/Accidental Death and Dismemberment (AD&D), Voluntary AD&D, Dependent Life and Long Term Disability Coverage Options. The *BenefitPartners* workbook highlights your choices under these Options, which are provided under the Quorum Health Group, Inc. Welfare Benefit Plan. Each Option is also described in a separate summary plan description. The Plan also offers you two flexible spending accounts described in the *BenefitPartners* workbook.

Please refer to the *BenefitPartners* workbook for additional information on Plan eligibility, enrollment, contributions and flexible spending account benefits.

# ADMINISTRATION

The Plan is administered by Quorum Health Group, Inc. (the "Company"). The Company is responsible for formulating and carrying out all rules and regulations to administer the Plan. The Company has the sole discretionary authority to make decisions regarding the interpretation or application of Plan provisions and determines the rights, benefits or eligibility of employees, participants and beneficiaries under the Plan. Any decision made by the administrator in good faith is final and binding on all parties.

The administrator has full discretionary authority when carrying out the provisions of the Plan. Any decision made by the administrator in good faith is final and binding on all parties.

# ENROLLMENT

If you do not enroll in the Plan when you are first eligible, you will be assigned the *default coverage* described in the *BenefitPartners* workbook. Default coverage will remain in effect until one of the following occurs: (i) you file an enrollment form during a later annual enrollment period, (ii) on account of a *change in status* (see the *BenefitPartners* workbook), (iii) in the case of medical coverage, during a special enrollment period, or (iv) in the case of Long Term Disability or Dependent Life Coverage following a review for evidence of good health.

If you fail to enroll for any plan year following your initial enrollment, you will automatically be considered to have filed an enrollment containing the same elections you had in effect for the prior year, excluding any election to contribute to a flexible spending account. You will need to reenroll each year in order to participate in the flexible spending accounts or to change your prior elections.

# CHANGING YOUR COVERAGE ELECTIONS

As explained in the *BenefitPartners* workbook, your coverage elections generally will remain in effect for the entire plan year unless you change your elections on account of a change in status, or if applicable, a special enrollment event. Further, Dental Option elections remain in effect until the next odd-year annual enrollment period (e.g., 2001, 2003, etc.) unless you change your elections on account of a change in status.



**"Myron Allenstein"**
**<myron@allenstein.co**
**m>**

01/14/2003 04:00 PM

To: <BrentCobb@alnd.uscourts.gov>
cc: "Shaw, Jim" <JRS@hfsllp.com>
Subject: Re: Harris v. Continental

January 14, 2003

Via E-mail

Hon. Robert Propst
Attention:  Brent Cobb

RE: Jacqueline Harris v. CNA
   Case Number: CV-2002-PT-477-M
   Response to Request of 1/9/03 and 1/10/03

Dear Judge Propst:

   I agree that the de novo standard of review is applicable.  My response to
your two requests is as follows:

Significance and Weight Accorded "Independent" Medical Opinions
Treating Physician Opinion is Accorded More Weight Than Opinion based on
"Paper Review" of Medical Records

   There are two types of "independent" medical opinions.  In a typical
Independent Medical Evaluation (IME), the examining physician examines the
claimant, reviews the relevant medical records and expresses an opinion.
Many insurance companies today request "paper reviews."  Available records
are mailed to a physician for review and the reviewing physician expresses
an opinion without ever examining or talking to the claimant.

Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1329-1330 (11th
Cir. 2001) recently acknowledged the rule that the opinion of a treating
physician in an ERISA case is accorded more weight than a reviewing
physician who examined the claimant:

"The district court also gave less weight to Myerburg's testimony , as he
was a reviewing physician, and not a treating physician or examining
physician.  The court cited Donaho v. FMC Corp., 74 F.3d 894, 901 (8th Cir.
1996), to support this conclusion.  The court concluded that any
administrative decision that Levinson was no longer disabled would 'lack
support in the record' and would be 'so overwhelmed by contrary evidence,
the administrative decision [would be] unreasonable and [would] not stand."

Since an opinion by an examining physician would be more reliable than an
opinion based on review of medical records, it logically follows that the
opinion of a treating physician is accorded much more weight than an opinion
based on a paper review of medical records.

   In Donoho v. FMC Corp., 74 F.3d 894 (8th Cir. 1986), the case relied upon
in Levinson, the 8th  Circuit held:

"The unreasonableness of a plan administrator's decision can be determined
by both the quantity and quality of the evidence supporting it.  We find the
evidence supporting the decision lacking on both counts.  First, the
evidence indicating continuing disability was overwhelming.  Second, the
only evidence supporting the committee's decision, Dr. Zaloudek's October
20, 1993 evaluation, is not as determinative as the committee would have us
believe.  Dr. Zaloudek was a reviewing physician; he never examined Donaho.

While this fact alone is not dispositive, it lessens the weight which the committee should have accorded Dr. Zaloudek's opinion. We have held, in Social Security cases, that a reviewing physician's opinion is generally accorded less deference than that of a treating physician, Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988), and we apply this rule in disability cases under ERISA as well.  Certainly where the reviewing physician's conclusions are contradicted by an examining physician and two treating physicians, reliance on the reviewing physician's conclusions 'seems especially misplaced' and constitutes an abuse of discretion."

The Eleventh Circuit has held in Social Security cases that substantial weight should be given to opinions of treating physicians unless good cause is shown to the contrary:

"We also hold that the Appeals Council improperly disregarded the findings of Parker's treating physician.  We have repeatedly held that the Secretary must accord 'substantial' or 'considerable' weight to the opinion of a claimant's treating physician unless 'good cause' is shown to the contrary. See e.g. Broughton v. Heckler, 775 F.2d 960, 961 (11th Cir. 1985); Spencer ex rel. Spencer v. Heckler, 765 F.2d 1090, 1093-94 (11th Cir. 1985).  As we explained in Broughton, '[i]t is not only legally relevant but unquestionably logical that the opinions, diagnosis and medical evidence of a treating physician whose familiarity with the patient's injuries, course of treatment, and responses over considerable length of time, should be given considerable weight.'  "
Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1988)

The general rule is that the opinion of a treating physician is accorded more weight than the opinion based on a "paper review" unless good cause is shown to the contrary.  In this case, CNA had unequivocal evidence by Dr. Smith, the treating physician, that death was caused by the accident when benefits were denied.  During the claim process, CNA never attempted to clarify Dr. Smith's opinion.  Instead, CNA rejected the opinion of Dr. Smith and relied on the opinion of their "paper review" expert.  CNA has not shown good cause for rejecting the opinions of Dr. Smith for the opinion of a non-examining expert.

In Reviewing a Denial of Benefits Under ERISA, the Court Should Consider the Information Available to CNA at the Time of the Denial

Under any standard of review in an ERISA claim, an insurance company cannot base its denial of benefits on information obtained after the suit is filed. In Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1327, 1328 (11th Cir. 2001) the 11th Circuit held that the insurance company could not present new evidence to substantiate the denial of an ERISA claim which was obtained after the lawsuit was initiated:

"We find that Reliance's decision on Levinson's claims were wrong from a perspective of de novo review, and its self-interest in this case requires that we determine whether the claims decisions were arbitrary and capricious.  It does not appear that there was a reasonable basis for Reliance's decisions, based on the evidence known to Reliance at the time it made the decisions.  Aside from the report from his law firm indicating that Levinson was a full-time employee, there did not appear to be any evidence before Reliance that contradicted Levinson's evidence from his physician that he was totally disabled under the terms of the plan.

In Levinson's case, Reliance - not the beneficiary - wanted a remand to consider evidence that would tend to show Levinson was not disabled.

We find persuasive the Eighth Circuit's reasoning in Davidson v. Prudential Ins. Co. of America, 953 F.2d 1093 (8th Cir. 1992). In that case, Davidson contended that the district court erred in refusing to remand the case to the plan administrator to consider a vocational report and a psychiatrist's report prepared after litigation had commenced. See id. at 1095. The district court refused to remand, because 'if Davidson believed the evidence he now offers was necessary for Prudential to make a proper benefits determination, Davidson should have obtained this evidence and submitted it to Prudential.' Id. We find that this reasoning should apply with equal force to the insurance company as to the beneficiary. Reliance had more than adequate opportunities to establish an administrative record containing evidence contradicting Levinson's evidence point to disability on two occasions: when it first considered Levinson's claim and upon Levinson's administrative appeal. Reliance did not do this. It was not until after litigation commenced that Reliance obtained evidence contradicting Levinson's evidence that he was disabled under the policy. Therefore, the district court's refusal to remand the issue of Levinson's eligibility for benefits to Reliance should be upheld."

The insurance company only has one opportunity to develop the file in support of its denial of benefits. In this case, there was no request for a remand for CNA to consider new evidence. Plaintiff did not seek to admit any medical evidence outside the record.

Prior to Reliance, the Eleventh Circuit consistently held that when the standard of review is arbitrary and capricious, the Court is limited to the facts known at the time of the decision. Buckley v. Metropolitan Life, 115 F.3d 936, 941 (11th Cir. 1997) ('in reviewing a termination of benefits under the arbitrary and capricious standard, the function of a reviewing court is to discern whether there was a reasonable basis for the decision, relying on the facts known to the administrator at the time the decision was made.') and Lee v. Blue Cross Blue Shield of Alabama, 10 F.3d 1547, 1550 (11th Cir. 1994) ('application of the arbitrary and capricious standard require us to look only to the facts known to the administrator at the time the decision was made to deny coverage.')

The language of Reliance precludes an insurance company from submitting new evidence acquired after the lawsuit was filed to substantiate its denial of benefits under any standard of review.

De novo review is not the same as a de novo trial.

" 'De novo means here, as it ordinarily does, [that]..the court's inquiry is not limited to or constricted by the.record, nor is nay deference due the.conclusion [under review].' Doe v. United States, 821 F. 2d 694, 697 (D.C. Cir. 1987) (emphasis added) (noting that for the review of administrative decisions, 'the reviewing court is not confined to the.record, but may pursue whatever further inquiry it finds necessary or proper to the exercise of the court's independent judgment." Id. At 698 n. 9 (treatise citation omitted)).

We hold that a district court exercising de novo review over an ERISA determination between beneficiary claimants is not limited to the evidence before the Fund's Administrator. Accordingly, the district court did not err by considering documents not before the Fund's Administrator.

Our decision does not require that a district court conduct a de novo evidentiary hearing or full trial de novo in making a determination between ERISA claimants. If the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a de novo review of the record of the administrator's decision, making its own independent

benefit determination.  See McMahan v. New England Mutual Life Ins. Co., 888
F.2d 426, 431 (6th Cir.1989) (where the record was insufficiently developed
for review of a fact based benefit denial, the court remanded for the
district court to "supplement the record" and then make a de novo benefit
determination)."
Luby v. Teamster Health, Welfare & Pension Trust Funds 944 F.2d 1176, 1184
(3rd Cir. 1991)

  Even if the deposition testimony of Dr. Smith is considered, Plaintiff
should still prevail because Dr. Smith testified that the accident was the
most likely cause of death:

"Q. Doctor, we discussed all the potential causes of death for Mr. Harris.
Would it be your opinion that out of the potential causes, the automobile
accident was more likely the cause as compared to the other possible causes
of death?...
A. I felt that it was."
(Dr. Smith depo. p. 75-76)

Dr. Smith's testimony on deposition was more equivocal than his statements
prior to deposition, but his testimony was still sufficient for Plaintiff to
prevail.


Conclusion

  CNA made the wrong decision.  Based on the evidence before CNA when the
benefits were denied, benefits should have been granted.  Even when
considering the deposition testimony of Dr. Smith, benefits should be
granted.  Plaintiff purchased insurance to protect her if her husband died
as a result of an accident.  Benefits should have been paid.


        Most sincerely,


        Myron K. Allenstein
        Attorney at Law

MKA:llt

cc:  Jim Shaw

----- Original Message -----
From: <BrentCobb@alnd.uscourts.gov>
To: <myron@allenstein.com>; <jrs@hfsllp.com>
Sent: Friday, January 10, 2003 10:06 AM
Subject: Harris v. Continental


> Judge Propst wanted me to e-mail you and say that, based on your previous
> responses, he assumes that all sides agree that de novo is the appropriate
> standard of review in this case.  Also, he wanted to send another
question,
> listed below.  Please respond via e-mail by next Wednesday, January 15,
> 2003.
>
> Thanks
>
> Brent Cobb
> Judge Propst's Law Clerk
> ----- Forwarded by Brent Cobb/ALND/11/USCOURTS on 01/10/2003 10:02
AM -----

```
>  .
>                        Robert Propst
>                                            To:      Brent
Cobb/ALND/11/USCOURTS
>                        01/10/2003           cc:
>                        09:58 AM             Subject:
>
>
>
>
> E mail to lawyers in Harris v Continental.    Gentlemen. I hate to be
> bothersome, but assume that all want me to apply appropriate law whether
> previously addressed by you or not. My next question is, assuming that
> because discretion not given to Continental the review is totally de novo,
> what is law on what I should consider under a de novo review. Everything
> presented at trial or just what was before Continental when claim was
> denied without deference? Quote from applicable cases.
>
>
>
```



**"Jim Shaw"**
**<JRS@hfsllp.com>**

01/14/2003 03:45 PM

To: <myron@allenstein.com>, <BrentCobb@alnd.uscourts.gov>
cc:
Subject: Re: Harris v. Continental

Our reply with case law is  being formatted so it can be sent to you. My
position is while the treating phys. gets some more deference the cases
aren't really applicable since this is not a treating issue but a
causation issue which can be determined equally by either  doctor.  In
this case they both come to the same conclusion, there is no way to say
that the cause of death was a reoccurrence of the  sub-arachnoid
bruise.
case law to follow
James R Shaw

>>> <BrentCobb@alnd.uscourts.gov> 01/09/03 12:38PM >>>
See below for another question from Judge Propst.  Please respond to me
via
e-mail by Tuesday, January 14.

Brent Cobb
Judge Propst's Law Clerk
----- Forwarded by Brent Cobb/ALND/11/USCOURTS on 01/09/2003 12:36 PM
-----


                    Robert Propst

                                    To:     Brent
Cobb/ALND/11/USCOURTS
                    01/09/2003      cc:

                    12:17 PM        Subject:




E mail to lawyers in Harris v Continental. Are there any appellate
court
cases which discuss the significance and weight of "independent"
medical
opinions such as was obtained by Continental in this case? Do they
always
belie an arbitrary and capricious determination by the court? If not,
how
is it determined when and when not to give them weight? Do they
sometimes
defeat an arbitrary and capricious finding and sometimes not? How
determined?

**Questions Presented**

1.    Are there any appellate court cases which discuss the significance and weight of independent medical opinions such as the one obtained by Continental in the current matter?

2.    Do they always belie an arbitrary and capricious determination by the court?  If not, how is it determined when and when not to give them weight, do they sometimes defeat an arbitrary or capricious finding and sometimes not? Do they sometimes defeat an arbitrary and capricious finding and sometimes not. How determined?

**Discussion**

    Generally less weight is given to the opinions of a reviewing physician than that of a treating physician or examining physician.  See Levinson v. Reliance Standard Life Insurance Co., 245 F 3d, 1321 (11th Cir. 2001)(citing Donaho v. F. M. C. Corp., 74 F 3d, 894, 901(8th Cir. 1996).  However, an administrator has no duty to give greater weight to the opinion of a treating physician than that of a reviewing physician.  See Menendez v. Sun Life of Canada, 2000 WL 300923, at 3.  Thus, an ERISA plan administrator may choose to rely on the opinions of independent medical consultants rather than those of a participant's own physicians.  See Salley v. DuPont DeNemours & Co., 966 F2d, 1011, 1016 (5th Cir. 1992).  In addition, the 11th Circuit has held that the general rule that greater weight should be given to the opinion of the treating physician is not applicable to the decision of the claims administrator of an ERISA-governed employee health plan where the treating physician has an economic interest in the matter.  See Jett v. Blue Cross and Blue Shield of Alabama, 890 F 2d, 1137 (11th Cir. 1989).

    In the case at bar, Dr. Smith's opinion should be given no more deference than that of Dr. LaForce. The medical record prior to Mr. Harris' death is clear and is not in dispute. Dr. Smith was put in no better position to ascertain Mr. Harris cause of death than Dr. LaForce; both were privy to the same information and had an opportunity to review medical records carefully. The records clearly demonstrate that Mr. Harris' condition continued to improve after the accident. All of the evidence demonstrates that Mr. Harris' death was, in fact, not caused by a subarachnoid hemorrhage arising from any injury received in his automobile accident, but instead, Mr. Harris pre-existing illnesses. As agreed by both Dr. Smith and Dr. LaForce, there exist insufficient evidence to state with any degree of medical certainty that Mr. Harris ' death was caused by a subaracnoid hemorrhage.

    Thus, in the current case, the amount of deference given to the opinion of Dr.

H0717365.1/1930-0637

LaForce is not material because the treating physician has clearly and unambiguously stated that Mr. Harris' death could have just as easily been caused by any of his life-threatening illnesses as a subarachnoid hemorrhage, leaving no dispute between the medical opinions before this court. The only evidence that the plaintiff has presented is Mr. Harris' death certificate. As previously argued to this Court, a death certificate is not conclusive as to the cause of death, especially in case such as this one where it is inconsistent with all medical evidence provided by both parties and contrary to medical science. See Union Central Life Ins. Co. V. Scott, 236 So.2d 328 (Ala. 1970).

An independent medical opinion standing alone will not always be found to justify an administrator's decision. See Jett, 890 F 2d at 1141. An administrator's decision must be supported by substantial evidence in order to avoid being found arbitrary and capricious. See Id. In Jett v. Blue Cross and Blue Shield of Alabama, Inc., Blue Cross denied coverage for hospitalization based on their finding that it was unnecessary. Their decision was based on an independent medical evaluation. The evaluation contradicted the two treating physicians, which stated that the Plaintiff's hospitalization was necessary. The Court found that Blue Cross acted arbitrarily and capriciously in not taking into account all relevant data.

Whether an administrator's decision will be found to be arbitrary and capricious depends on whether there exists a reasonable basis for the decision. Duckett v. Blue Cross and Blue Shield of Alabama, 123 F. Supp. 2d 1286 (Ala. 2000). Whether a claim administrator's decision was based upon reasonable evidence must be determined on a case-by-case basis.

In the case at bar Continental is not asking the Court to make a determination based on Dr. LaForce's opinion alone. Instead Continental ask this court to take into account all evidence before it. Plaintiff on the other hand only wants the Court to look at the tidbits of evidence that would appear to support her claim. Under either scenario, the Court's determination must unquestionably be that Continental correctly denied benefits under the policy.

### Brief Answers

1.   Yes.   Generally, a reviewing physician's opinion is given less deference than a treating or examining physician. However, in the case at bar, where the treating physician and reviewing physician are on even footing when formulating their opinions, their opinions should be given similar weight.

2.   No.   The reasonableness of an administrator's decision must be made on a case-by-case basis.

H0717365.1/1930-0637

**Brent Cobb**            To: Robert Propst/ALND/11/USCOURTS@USCOURTS
01/09/2003 07:51 AM       cc:
                          Subject: Re: Harris v. Continental

This is an interesting twist . . . .

----- Forwarded by Brent Cobb/ALND/11/USCOURTS on 01/09/2003 07:50 AM -----



**"Myron Allenstein"**        To: <BrentCobb@alnd.uscourts.gov>
**<myron@allenstein.co**      cc: "Shaw, Jim" <JRS@hfsllp.com>
**m>**                        Subject: Re: Harris v. Continental

01/08/2003 04:34 PM


January 8, 2003


Via Email and U.S. Mail
Hon. Robert Propst
581 Hugo L. Black U.S. Courthouse
1729 5th Avenue North
Birmingham, AL  35023

RE: Jacqueline Harris v. CNA
  Case Number: CV-2002-PT-477-M

Dear Judge Propst:

  Thank you for the email that I received from Brent Cobb, your law clerk.

  I am certain that the record reflects that the entire claim process was
conducted by CNA.  Quorum was never involved in evaluating the claim.  At
some point, Gadsden Regional was sold by Quorum and is now owned by another
entity.  It is quite possible that, during the claim process, the hospital
had already been sold and was not owned by Quorum.  I do not know the date
of sale.

  Under these circumstances, I agree the standard of review would be de novo
instead of the heightened arbitrary and capricious standard.  I assumed that
the heightened arbitrary and capricious standard applied from prior cases.

        Most sincerely,



        Myron K. Allenstein
        Attorney at Law

MKA:alb
Cc: Jim Shaw (via Email and U.S. Mail)

## Question Presented

Assuming that *de novo* review is appropriate, what evidence may be considered by the Court in reaching this decision?

## Discussion

There is a split among the Circuits as to whether a *de novo* review should include facts not before the plan administrator. See Kirwan v. Marriott Corp., 10 F 3d, 784 (11th Cir. 1994). However, the Eleventh and Third Circuits have squarely held that *de novo* review includes facts not before the administrator. Specifically, the Court in Kirwan v. Marriott Corp. stated:

> In this Circuit, a District Court conducting a *de novo* review of an administrator's benefits determination is not limited to the facts available to the administrator at the time of the determination.

Id. (citing Moon v. American Home Assur. Co., 888 F 2d 86 (11th Cir. 1989))("American Homes' contention that a court conducting a *de novo* review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of *de novo* review."). This view has been upheld in cases subsequent to Kirwan. See Grant v. Provident Life And Accident Insurance Co., 2001 WL 1671028 (S.D. Fla. 2001)("in the Eleventh Circuit, when conducting a *de novo* review of a plan administrator's determination of entitlement to benefits, a district court is not limited to the facts available to the administrator at the time of the determination"); Harrison v. Aetna Life Ins. Co., 925 F.Supp. (M.D. Fla. 1996)("In conducting a de novo review, the district court is not limited to the facts available to the plan administrator at the time of the coverage determination").

Thus, if this Court conducts a *de novo* review of Continental's determination to deny benefits, it is not limited to the facts available to Continental at the time of that determination.[1]

Taking into account the deposition testimony of Dr. Ken Smith and the report of Dr. LeForce, any contention that Mr. Harris died as a result of a subarachnoid hemorrhage is based strictly on conjecture. As pointed out by Mr. Allenstein, Dr. Smith stated that at the time of Mr. Harris' death, he felt that there was a chance that he could have died as a result of the accident. However, after Dr. Smith had time to review the record and to take into account all of Mr. Harris' pre-existing illnesses, Dr. Smith was unwilling to testify that he currently felt that the automobile accident was anymore likely the cause of Mr. Harris' death than any of his many pre-existing and life-threatening

illnesses. Specifically, Dr. Smith, under vigorous examination from Mr. Allenstein, would only state: "At the time, I felt that there was a chance that he could have bled again just, you know, as easily could have been a heart attack or stroke or whatever." (Depo of Dr. Kenny Smith, page 57; lines 15- 18.).

Dr. Smith simply verified what Dr. LaForce and Continental has said from the outset, Mr. Harris death was not caused, to any degree of medical or legal certainty, independently and exclusively by an accident as required for benefits under the Continental policy. To not consider Dr. Smith's clear and unambiguous testimony, as the plaintiff suggests, would be repugnant to any sense of justice.

Viewed objectively, the outcome of this matter is quite clear. The terms of the Continental policy clearly require that a death be exclusively and independently caused by an accident in order to receive benefits. The overwhelming amount of evidence demonstrates that Mr. Harris' death was, in fact, caused by non-accidental means, his many pre-existing illnesses. Therefore, Continental's decision to deny benefits was, without question, correct.

## Brief Answer

This Court should consider all evidence before it in reaching its decision.

[1] For a discussion of what evidence this court should consider under the arbitrary and capricious or heighted arbitrary and capricious standards please refer to Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment.

**Brent Cobb**
01/10/2003 07:37 AM

To: Robert Propst/ALND/11/USCOURTS@USCOURTS
cc:
Subject: Re: Harris v. Continental

Here is def's answer.  I'll look into the second question as well
----- Forwarded by Brent Cobb/ALND/11/USCOURTS on 01/10/2003 07:36 AM -----



**"Jim Shaw"**
**<JRS@hfsllp.com>**
01/09/2003 04:11 PM

To: <myron@allenstein.com>, <BrentCobb@alnd.uscourts.gov>
cc:
Subject: Re: Harris v. Continental

Dear Judge Propst:
My answer is not quite as simple. As the court noted at  p. 17 of the
tentative findings of fact, both parties agreed the heightened arbitrary
or capricious standard governed.  This would require the court  to
review all the evidence de novo as the first stage; and, if correct the
decision of the claims administrator stands.  If however the decision
were determined wrong then the court would proceed on an analysis  under
the heightened standard presumably via affidavits or an additional
hearing.
The problem is the plan documents show Quorum the insured to be the
plan
administrator with discretionary function language.  It also shows the
accidental death benefit to be a fully insured policy issued and
administered by Continental  Ins. Co.  In practice Continental functions
as the administrator with a complete review and appeal process.  Quorum
does not participate in the decision although there is language allowing
a claimant to appeal to Quorum.
In point of fact Continental assumes all  the claim functions for
Quorum but there is no discretionary function language specifically
directed to Continental.
We have looked for case law more directive and have found nothing more
of significance.
I cannot find authority to represent to the court the assumption of
claims administration in  a fully insured policy is enough to make the
standard of review other than de novo.

Respectfully submitted,

James R. Shaw

>>> <BrentCobb@alnd.uscourts.gov> 01/08/03 09:32AM >>>
See question below from Judge Propst.  Please respond to me via e-mail
by
tomorrow (1/9).  Also, please respond ASAP to let me know you received
this
message.  If you have any questions, please call me at 205-278-1860.

Thanks

Brent Cobb
Judge Propst's Law Clerk
----- Forwarded by Brent Cobb/ALND/11/USCOURTS on 01/08/2003 09:29 AM
-----

                    Robert Propst

                              To:     Brent

Cobb/ALND/11/USCOURTS
01/08/2003          cc:

09:04 AM          Subject:     Re: (Document
link: Brent Cobb)


E mail lawyers in Harris v Continental. Ask for reply by e mail..
Question:   It appears that the discretion given with regard to claims
was
given to Quorum. Did Quorum make the decision? If not, is the standard
de
novo? Elaborate.



**"Myron Allenstein"**
**<myron@allenstein.co**
**m>**

To: <BrentCobb@alnd.uscourts.gov>
cc: "Shaw, Jim" <JRS@hfsllp.com>
Subject: Re: Harris v. Continental

01/17/2003 12:58 PM

January 17, 2003


Via Email
Hon. Robert Propst
Attn: Brent Cobb

RE: Jacqueline Harris v. CNA
   Case Number: CV-2002-PT-477-M
   De Novo Review - Plaintiff's Reply

Dear Judge Propst:

   I strongly disagree with the Defendant's position on de novo review.  De
Novo review is not de novo trial.  On de novo review, the record is the
basic evidence being reviewed.  Under de novo review, the plaintiff is
entitled to submit additional evidence in order to expand on the record.
The Plaintiff may submit updated medical records to show the seriousness of
claimant's condition when the application for benefits was made.  Under de
novo review, the Defendant can probably offer testimony explaining the
rational for the decision.  Such evidence was offered without objection in
this case.  However, under no circumstances should the insurance company be
allowed to substantiate a denial based on evidence attained after suit is
filed.  The insurance company has a fiduciary duty to develop the record and
evaluate the claim.  In an exceptional case, if new evidence is disclosed,
which is relevant to the decision, perhaps the insurance company could ask
for a remand to consider the new evidence.  The court might, in its
discretion, allow a remand to consider new evidence under exceptional
circumstances.  A remand was not requested in this case.

   A de novo review does not mean that the insurance company can hire a new
team of experts to defeat a claim when the claim was previously denied
without substantial reason.  Instead, de novo review means no deference
given to the decision under review and some flexibility in allowing the
claimant to further substantiate the claim.

   Defendant argues that an insurance company has more rights under de novo
review then under arbitrary and capricious review.  It is just the
opposite - the insurance company has fewer rights under de novo.  The
appellate decisions from the Eleventh Circuit have not clearly defined the
process.  The Levinson case is the closest guide.  Although Levinson is a
heightened arbitrary case, the holding applies to all ERISA cases:

   "We find that Reliance's decision on Levinson's claims were wrong from a
perspective of de novo review, and its self-interest in this case requires
that we determine whether the claims decisions were arbitrary and
capricious.  It does not appear that there was a reasonable basis for
Reliance's decisions, based on the evidence known to Reliance at the time it
made the decisions.  Aside from the report from his law firm indicating that

Levinson was a full-time employee, there did not appear to be any evidence
before Reliance that contradicted Levinson's evidence from his physician
that he was totally disabled under the terms of the plan.

In Levinson's case, Reliance - not the beneficiary - wanted a remand to
consider evidence that would tend to show Levinson was not disabled.

We find persuasive the Eighth Circuit's reasoning in Davidson v. Prudential
Ins. Co. of America, 953 F.2d 1093 (8th Cir. 1992). In that case, Davidson
contended that the district court erred in refusing to remand the case to
the plan administrator to consider a vocational report and a psychiatrist's
report prepared after litigation had commenced. See id. at 1095. The
district court refused to remand, because 'if Davidson believed the evidence
he now offers was necessary for Prudential to make a proper benefits
determination, Davidson should have obtained this evidence and submitted it
to Prudential.' Id. We find that this reasoning should apply with equal
force to the insurance company as to the beneficiary. Reliance had more
than adequate opportunities to establish an administrative record containing
evidence contradicting Levinson's evidence point to disability on two
occasions: when it first considered Levinson's claim and upon Levinson's
administrative appeal. Reliance did not do this. It was not until after
litigation commenced that Reliance obtained evidence contradicting Levinson'
s evidence that he was disabled under the policy. Therefore, the district
court's refusal to remand the issue of Levinson's eligibility for benefits
to Reliance should be upheld."

The insurance company only has one opportunity to develop the record in
support of its denial of benefits. In this case, there was no request for a
remand for CNA to consider new evidence. Plaintiff did not seek to admit
any medical evidence outside the record. The Defendant should be allowed to
submit additional medical evidence outside the record.

        Most sincerely,


        Myron K. Allenstein
        Attorney at Law

CC: Jim Shaw

----- Original Message -----
From: <BrentCobb@alnd.uscourts.gov>
To: <myron@allenstein.com>; <jrs@hfsllp.com>
Sent: Friday, January 10, 2003 10:06 AM
Subject: Harris v. Continental


> Judge Propst wanted me to e-mail you and say that, based on your previous
> responses, he assumes that all sides agree that de novo is the appropriate
> standard of review in this case. Also, he wanted to send another
question,
> listed below. Please respond via e-mail by next Wednesday, January 15,
> 2003.
>
> Thanks
>
> Brent Cobb
> Judge Propst's Law Clerk
> ----- Forwarded by Brent Cobb/ALND/11/USCOURTS on 01/10/2003 10:02
AM -----
>
>                        Robert Propst

.Date            :        January 22, 2003

E-Mail to        :        Honorable Robert B. Propst

From             :        James R. Shaw

Re               :        Harris v. Continental Casualty
                          Case Number       :
                          Our File          :        1930-0637

Despite Plaintiff's contention, *de novo* means *de novo*. It is well settled that in this Circuit a District Court conducting a *de novo* review of an administrator's benefit determination does not limit it to the facts available to the administrator at the time of the determination. See Kirwan v. Marriott Corp., 10 Fed. 3d, 784, 789 (11th Cir. 1994). Plaintiff argues that *de novo* review in the ERISA context is somehow different than in any other case. To support this contention, plaintiff cites the Levinson case, which was decided under the heightened arbitrary and capricious standard. Plaintiff's continued reliance on the Levison case is unfounded.

In Luby v. Teamster's Health, Welfare and Pension Trust Funds, 944 Fed. 2d, 1176 (3rd Cir. 1991), a case which has been cited with approval in this circuit, the Court correctly and succinctly stated:

"Limiting the review of an ERISA benefit decision to evidence before the administrator was appropriate in those pre-Firestone cases where a deferential standard of review was applied. The limitation makes little sense, however, when a plan administrator's decision is reviewed *de novo* . So limiting the scope is 'contrary to the concept of *de novo* review.' ( Moon v. American Home Assurance Co., 888 Fed 2d 86, 89 (11th Cir. 1989).) '*De novo* means *de novo* here, as it ordinarily does, [that]. . . the Court's inquiry is not limited to or constricted by the . . . record nor was any deference due to the . . . conclusion [under review].' Doe v. United States, 821 Fed. 2d 694, 697 (D. C. Cir.1987)(emphasis added). (Noting that for the review of administrative decisions, 'the reviewing court is not confined to the . . . record, but may pursue whatever further inquiry it finds necessary or proper to the exercise of the Court's independent judgment.'"

Thus, there can be no question that under a *de novo* review this Court may consider any and all evidence submitted.

Next, the Plaintiff acknowledges that under *de novo* review the Plaintiff is entitled to submit additional evidence in order to expand the record and the Defendant can offer testimony explaining the rationale of the decision. Under this logic, the testimony of Dr. Smith should still be admitted. As Continental has stated in previous submissions to this Court, Dr. Smith simply further explained what Continental and Dr. LaForce have

been stating all along: that Mr. Harris' death cannot be stated with any degree of medical or legal certainty to have arisen from a re-bleed of the subarachnoid hematoma. Furthermore, to allow the Plaintiff free reign to seek additional evidence to support their claim and then to selectively submit the information which it finds favorable would be contrary to any sense of fair play. In this case, Plaintiff moved this Court to extend the period for discovery so that the deposition of Dr. Smith could be taken. It was only at this time that Continental went forth with the deposition of Dr. Smith. For Plaintiff to now say that Dr. Smith's testimony should not be admitted, when Plaintiff was the party which moved for an extension to allow said deposition, is both illogical and contradictory. Plaintiff sought an extension so that the testimony of Dr. Smith could be obtained, and has subsequently cited portions of

Dr. Smith's deposition testimony. Thus, the Plaintiff should be estopped from contesting the admissibility of his testimony.

For the foregoing reasons, the deposition testimony of Dr. Smith should be considered by this Court in reaching its decision. However, as argued at Trial, and in the numerous admissions to this Court, Continental is entitled to judgment even if this Court does not take into consideration the testimony of Dr. Smith.